FILED

2005 OCT 11 P 3: 10

U.S. DISTRICT COURT
BRIDGEPORT, CONN

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

LOUIS PAGLIUCO, ET AL          :
                               :
                  Plaintiff,   :          CIV. NO. 3:01CV00836 (WIG)
                               :
        vs.                    :
                               :
CITY OF BRIDGEPORT, ET AL      :
                               :
                  Defendants   :          SEPTEMBER 29, 2005

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

*index*                                                              **page**

A.    Introduction ................................................................. 1

B.    Facts ........................................................................ 3

C.    Summary of Discussion ...................................................7

D.    Discussion ................................................................. 9

      1.    Standard for Summary Judgment   ..................................... 9

      2.    Equal Protection and Standing ........................................ 10

            (a)   Equal Protection ..................................................... 10

            (b)   Similarly Situated ................................................... 13

            (c)   Third Party Standing ............................................... 15

      3.    Substantive Due Process ................................................. 15

JBF05019                                    i

*index*                                                                                    *page*

4.    Federal Governmental Immunity ……………………………………… 19

5.    Reporting of Child Abuse and Health Director's Duties …………,… 22

      (a)    Statutory Immunity ……………………………………… 22

      (b)    Health Director ……………………………………….……… 27

      (c)    Governmental Immunity ……………………………….……… 28

6.    Connecticut Liquor Control Act ……………………………….………… 29

7.    Mental Distress …………………………………………………………… 30

8.    Monell §1983 Claim …………………………………………………… 34

9.    Connecticut Constitution ……………………………………………… 35

10.   Use and Occupancy Payments ……………………………………… 36

11.   Equal Protection Claims Against Lt. Sapiro ………………………… 38

      (a)    Equal Protection………………………………………………… 38

      (b)    Standing …………………………………………………………… 40

      (c)    Governmental Immunity ………………………………………… 41

12.   Substantive Due Process Claims Against Thomas Gecewicz
      and Dr. Josette Boukhalil ……………………………….……………… 46

      (a)    Substantive Due Process……………………………………… 46

JBF05019

## A.    **INTRODUCTION**

The Plaintiff, Louis Pagliuco, was an owner and operator of the Plaintiff, 2284 Corporation, which did business as the Dangerous Curves Strip Club.

On diverse occasions the Defendant, Lt. (formerly Sergeant) Sapiro and other police officers inspected the Dangerous Curves Strip Club.  The police officers were employed by the City of Bridgeport.

The Defendants, Thomas Gecewicz and Josette Boukhalil, M.D., were on a health inspection of the Dangerous Curves Strip Club when they saw a minor child, the son of the Plaintiff, Louis Pagliuco, sitting at the bar.  The child made comments to them regarding sexual acts and a females anatomy which caused them to make a report to the Connecticut Department of Children and Families (DCF).

The Plaintiff brought a suit alleging equal protection claims (discriminatory enforcement based on race).  The Plaintiff also alleged that he suffered severe emotional distress regarding the complaint filed by the Defendants, Gecewicz and Boukhalil, with DCF.

The Defendants, Gecewicz, Sapiro and Boukhalil, claim qualified governmental immunity.  In addition, Gecewicz and Boukhalil claim statutory immunity for making the report with DCF.

The City of Bridgeport took title to the real property on or about October 15, 1998 where the Dangerous Curves Strip Club was located.  Bridgeport v. 2284

Corporation, Inc., 63 Conn. App. 624, 625, 778 A.2d 222 (2001).    The City of Bridgeport gave notice to quit, dated February 9, 1999, on or before February 20, 1999.

The Plaintiff contested the notice to quit.  A hearing was held wherein the court granted possession.  The court's order was stayed during the pendency of the Plaintiff's appeal in City of Bridgeport v. 2284 Corporation, Inc., 63 Conn. App. 624, 778 A.2d 222 (2001), cert. denied 258 Conn. 904, 782 A.2d 136 (2001).  The court's denial of certification was dated September 13, 2001, and the Plaintiff was evicted on Sunday, September 23, 2001.

The City sought use and occupancy payments during this legal process, but the trial court refused to order such payment and the Plaintiff refused to make rental and/or use and occupancy payment during the almost three year time frame it took to evict the Plaintiffs.  The monthly rent under the prior lease was $2,200.00.

The City of Bridgeport claims rent, use and occupancy fees for thirty-six (36) months in the amount of $79,200.00.

In Paragraph 4 the Plaintiff's only allegation regarding the City of Bridgeport was that it "was a municipal corporation . . . and it employed the other defendants." That allegation is insufficient to impose any liability on the City.

In the original complaint the Plaintiff named Joseph Ganim as a Defendant in the heading but did not allege any facts regarding a claim against him.  In the

amended complaint the Plaintiff deleted Joseph Ganim from the heading of the amended complaint. It is obvious that Joseph Ganim is not a proper Defendant in this action.

## B.    FACTS

Lt. Robert Sapiro (formerly Sergeant) inspected a number of bars, restaurants and package stores in the Westside Precinct of the City of Bridgeport, pursuant to Connecticut's Liquor Control Act. One of the establishments that was inspected was Dangerous Curves Strip Club. There were approximately eleven (11) inspections of the Dangerous Curves Strip Club over a three (3) year period of time. During those inspections, police officers found used condoms on the floor, tickets for dancers on the floor (a patron would go to the bar and buy a ticket for $5.00/$20.00 for a dancer to perform a lap dance for the patron in a small private room), underage patrons (under 21 years old), underage dancers (under 21 years old), no valid liquor permit, drugs, indications of prostitution, naked dancing, dancers mingling with patrons, and patrons touching dancers (Exhibit 1).

A number of the foregoing were violations of Connecticut's laws and regulations of the liquor industry (Exhibit 7).

In December of 2000, the State Police, in conjunction with the Statewide Cooperative Crime Control Task Force, commenced a covert investigation into

narcotics and prostitution activity at the Dangerous Curves Strip Club. The investigation found:

Liquor Violations, including underage drinking, bouncers/bartenders did not check patrons identification, underage dancers being served alcohol, patrons entering establishment with open alcohol containers, patrons allowed to exit establishment with open containers, underage dancers allowed go dance without authorization from parents, dancers exposing breasts and genitals, dancers inappropriate touching patrons, and patrons inappropriately touching dancers.

Prostitution, whereby dancers offering sexual acts in exchange for monies.

Narcotic Activity, including dancers and patrons smoking marijuana throughout the establishment, numerous dancers involved in narcotic sales to police undercover agents, security guard/parking attendant involved in narcotic sales to undercover officers, bartender and dancer telephoned drug dealer to arrange a narcotic transaction with an undercover officer, numerous patrons involved in narcotic sales with undercover police officers, hand-to-hand narcotic transactions occurring in the "open," and security guard/parking attendant serving as a "look-out" for police presence.

As a result of the investigation, a number of criminal prosecutions were commenced.

The Liquor Division of the State of Connecticut Department of Consumer Protection imposed a forty-five day suspension and Ten Thousand Dollars ($10,000.00) fine on Louis Pagliuco doing business under the trade name of Dangerous Curves. The suspension began on March 20, 2000 and ended on May 3, 2000 (Exhibit 6).

The Office of the Chief States Attorney, on behalf of the State of Connecticut, brought a civil nuisance abatement action against Louis Pagliuco, Louis Pagliuco d/b/a Dangerous Curves Café, the Real Property and Premises known as 2294 Fairfield Avenue, Bridgeport, Connecticut a/k/a Dangerous Curves Café (Exhibit 8). That action, with a return date of February 13, 2001, was brought pursuant to Connecticut General Statute §19a-343, et seq. The complaint alleged, in part, that the real property was "a known narcotics trafficking area within which illicit drugs can be purchased openly and on a daily basis." (paragraph 9); and that "property was known for prostitution." (paragraph 10).

Between December 19, 2000 and February 15, 2001, members of the Statewide Cooperative Crime Control task Force went to Dangerous Curves Café on no fewer than seventeen (17) separate occasions to investigate illegal activity occurring within the premises. This illegal activity resulted in the issuance of eighteen

(18) arrest warrants for eleven (11) different individuals, various drug offenses, and prostitution (paragraph 14).

On or about May 14, 2001, the State received judgment based on an April 9, 2000 stipulation wherein Pagliuco agreed that no illegal drugs or prostitution would be permitted on the premises. Pagliuco also agreed to a number of additional conditions relating to the conduct of his business.

On December 22, 2000, the Defendants, Health Director Thomas Gecewicz and Josette Boukhalil, M.D. of the Health Department of the City of Bridgeport, inspected the Dangerous Curves Strip Club and found various violations of the health code. During the inspection of Dangerous Curves Strip Club, they saw a three/four year old boy sitting at the bar with strippers. The child made inappropriate comments regarding strippers breasts and genital areas. Thomas Gecewitz and/orJosette Boukhalil filed a complaint with the State Department of Children and Families regarding the child's presence at the strip club. The child is the son of the Plaintiff, Pagliuco (Exhibits 2 and 3).

The City of Bridgeport is the owner of the subject property known as 2284, 2288, 2290 and 2294 Fairfield Avenue, Bridgeport, Connecticut. The City acquired title to the property on or about October 15, 1998 by way of a strict foreclosure of delinquent taxes in an action entitled <u>City of Bridgeport Tax Collector v. Joseph Voll,</u>

et al, CV94-0318563S.  The Plaintiffs were tenants of Joseph Voll.  They entered a lease in 1993.  See Bridgeport v. 2284 Corporation, 63 Conn. App. 624 (2001).

The City of Bridgeport instituted an eviction proceeding against the Plaintiffs with the serving of a Notice to Quit on or about February 5, 1999 on the grounds of "Lapse of Time; non-payment of rent;  you never had a right or privilege to occupy such premises;  and right or privilege to occupy such premises has terminated." Thereafter, the City of Bridgeport served and filed a complaint for eviction in the Connecticut Superior Court with a return date of April 20, 1999.  The City of Bridgeport received judgment of possession, which the Plaintiffs in this action appealed to Connecticut's Appellate Court. Id.

The Plaintiffs have never paid rent and/or use and occupancy payments to the City of Bridgeport.  Their lease with the prior owner provided for a basic rent charge of $2,200.00 per month.  The Plaintiffs were evicted on September 23, 2001.  The Plaintiffs owe thirty six months of back rent and/or use and occupancy payments for the sum of $79,200.00 (Exhibit 4).

## C.    SUMMARY OF DISCUSSION

The Defendants in this action maintain that:

*       the Plaintiff, Pagliuco, has not alleged an equal protection claim because the Dangerous Curves Strip Club is not a similar type of business to the cited businesses which are generally family oriented restaurants, and

because the Plaintiff does not have standing to exert equal protection claims of third parties;

\*      the Defendant, Lt. Sapiro, has qualified governmental immunity for inspection of the Dangerous Curves Strip Club pursuant to the State of Connecticut's Liquor Control Act;

\*      the Defendants, Thomas Gecewicz and Dr. Josette Boukhalil, have qualified governmental immunity for filing a report with the State of Connecticut Department of Family and Children;

\*      the Defendants, Thomas Gecewicz and Dr. Josette Boukhalil, have statutory immunity for filing a report with the State of Connecticut Department of Family and Children.

\*      the facts alleged by the Plaintiff do not rise to a substantive due process claim;  and

\*      the Plaintiffs have not alleged a claim against the City of Bridgeport.

The City of Bridgeport has a claim of unjust enrichment for use and occupancy non-payment for the period that the Plaintiffs were in possession of the premises.

Because of the variety of issues involved in this case, the Defendants have chosen to set forth the various legal standards in sections D1 through D10 and the application of those standards in sections D5, D7, D11 and D12.

## D.    DISCUSSION

### 1.    Standard for Summary Judgment

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See:  Fed. R. Civ. P. 56(c), Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Miner v. City of Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248).   After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523.  Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryand v. Maffucci, 923 F.2d

979, 982 (2d Cir. 1991); see also: <u>Suburban Propane v. Proctor Gas, Inc.</u>, 953 F.2d

780, 788 (2d Cir. 1992). Additionally, "where the non-movant bears the burden of

proof at trial, the movant can satisfy its burden of production by pointing out an

absence of evidence to support an essential element of the non-movant's case."

<u>Ginxberg v. Healey Car & Truck Leasing, Inc.</u>, 189 F.3d 268, 270 (2d Cir. 1999)

(citing <u>Celotex</u>, 477 U.S. at 323-24 and <u>Tops Mkts., Inc. v. Quality Mkts., Inc.</u>, 142

F.2d 90, 95 (2d Cir. 1998))

The "nonmoving party must come forward with specific facts showing that

there is a genuine issue of material fact for trial . . . Conclusory allegations, conjecture

and speculation . . . are insufficient to create a genuine issue of fact." (citations and

internal quotation marks omitted). <u>Shannon v. New York City Transit Authority</u>, 332

F.3d 95, 99 (2d Cir. 2003).

## 2. <u>Equal Protection and Standing</u>

### (a)  **Equal Protection**

Section 1 of the Fourteenth Amendment of the United States

Constitution provides that no State shall "deny to any person within its jurisdiction the

equal protection of the law."

A claim under 42 U.S.C. §1983 has "two essential elements: (1) the defendant

acted under color of state law; and (2) as a result of the defendant's actions, the

plaintiff suffered a denial of her federal statutory rights, or her constitutional rights of

privileges." <u>Annis v. County of Westchester</u>, 136 F.3d 239, 245 (2d Cir. 1998);  see also: <u>Giordano v. City of New York</u>, 274 F.3d 740, 750 (2d Cir. 2001).

The Honorable Judge Burns stated, in <u>Scott v. Town of Monroe, et al</u>, 306 F. Supp. 2d 191, 197 (D. Conn. 2004), that "The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution is essentially a direction that all persons similarly situated should be treated alike. <u>Zahra v. Town of Southold</u>, 48 F.2d 674, 683 (2d Cir. 1995) (quoting <u>City of Cleburne Living Ctr., Inc.</u>, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)).  In situations where a plaintiff claims selective enforcement of a provision which on its face is constitutional, the Second Circuit has ruled that such a claim is proper where it is established that:  (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations such as race or religion, to **punish or inhibit** the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." (internal punctuation omitted).  In accord: <u>Crowley v. Courville</u>, 76 F.3d 47, 52-53 (2d Cir. 1994).

The Honorable Judge Underhill, in <u>Batiste, et al v. City of New Haven, et al</u>, 239 F. Supp. 2d 213, 227 (D. Conn. 2002) phrased the above two part test in three parts.  He stated that "The equal Protection Clause requires that the government treat similarly situated people alike. <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432,

439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). In order to make a prima facie case of intentional discrimination based on race, plaintiffs must show that (a) they were selectively treated compared with other similarly situated people, (b) that the selective treatment was based on race, and (c) that the decision markers acted with discriminatory purpose. <u>Knight v. Connecticut Department of Public Health</u>, 275 F.3d 156, 166 (2d Cir. 2001) (quoting <u>McCleskey v. Kemp</u>, 481 U.S. 279, 292, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987). Discriminatory purpose . . . implies . . . that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group. <u>Personal Administrator v Feeney</u>, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870, (1979); <u>Southside Fair Housing Committee v. City of New York</u>, 928 F.2d 1336, 1352 (2d Cir. 1991). In addition, 42 U.S.C. §1982 requires the defendants to employ their official powers to serve the proper ends of their governmental duties, not for the purpose of injuring the plaintiffs. <u>LeClair v. Saunders</u>, 627 F.2d 606, 610 (2d Cir. 1980)." (internal quotation marks omitted).

A claim alleging a violation of the equal protection clause requires specific allegations of discriminatory purpose and intend. "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. <u>Village of Arlington Heights v. Metropolitan Housing Development Corp.</u>, 429 U.S.

252, 265, 97 S. Ct. 555, 563, 50 L. Ed. 2d 450 (1977). Gagliardi v. Village of Pawling, 18 F.3d 188, 193 (2d Cir. 1994).

Conclusory allegations of selective treatment are insufficient to state a claim. See: Albert v. Carovano, 851 F.2d 561 (2d Cir. 1988). Rather, a plaintiff "must allege purposeful and systematic discrimination by specifying instances in which [the plaintiff] [was] singled . . . out for unlawful oppression in contrast to others similarly situated." Albert, Id. at 573 (internal quotations omitted); see also: DeLoreto v. Ment, 944 F. Supp. 1023, 1033 (D. Conn. 1996) (plaintiff must allege "specific conduct that violated [his/her] rights to equal protection, the time and place of the conduct, and the identity of the official who engaged in the conduct").

Failure to satisfy either prong of the tests requires dismissal of the plaintiff's claim. Penlyn Development Corp. v. The Incorporated Village of Lloyd Harbor, 51 F. Supp. 2d 255, 264 (E.D. N.Y. 1999).

### (b)    Similarly Situated

"The formula for determining whether individuals or entities are similarly situated for equal protection purposes is not always susceptible to precise demarcation. See: Coyne, 972 F.2d at 444-45 (The 'line between sufficient facts and insufficient conclusions is often blurred.') (citation omitted). As we have explained, however, the test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as

in the lawyer's art of distinguishing cases, the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result.  Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples.  <u>Dartmouth Review v. Dartmouth Coll.</u>, 889 F.2d 13, 19 (1st Cir. 1989) (citation omitted); see also: <u>Rodriguez-Cuervos v. Wal-Mart Stores, Inc.</u>, 181 F.3d 15, 21 (1st Cir. 1999)." (Internal quotation marks omitted), <u>Barrington Cove Limited Partnership v. Rhode Island Housing and Mortgage Finance Corp., et al</u>, 246 F.3d 1, 8 (1st Cir. 2001).  See also: <u>Holmes Jr. v. Gainor, et al</u>, 313 F. Supp. 2d 345, 356 (S.D. N.Y. 2004); <u>Clarke, et al v. Sweeney, et al</u>, 312 F. Supp. 2d 277, 301 (D. Conn. 2004) ("To be 'similarly situated,' the individuals with whom [the plaintiff] attempts to compare herself must be similarly situated in all material respects.")

The Supreme Court has explained that a claimant alleging selective enforcement of facially neutral criminal laws must demonstrate that the challenged law enforcement practice "had a discriminatory effect and that it was motivated by a discriminatory purpose." n4 <u>Wayte v. United States</u>, 470 U.S. 598, 608, 105 S. Ct. 1524, 84 L. Ed. 2d 547 (1985).  "To establish discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." <u>United States v. Armstrong</u>, 517 U.S. 456, 465, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996).

**(c)    Third Party Standing**

In order to have standing, a party must allege (1) a personal injury in fact, (2) a violation of his or her own, not a third party's rights, (3) that the injury falls within the zone of interests protected by the constitutional guarantee involved, (4) that the injury is traceable to the challenged act, and (5) that the courts can grant redress for the injury.   See:   <u>Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 472-74, 102 S. Ct. 752, 758-59, 70 L. Ed. 2d 700 (1982);  see also: <u>Dow Jones & Company v. Simon</u>, 842 F.2d 603, 606 (2d Cir. 1988).

Third party standing can rarely be invoked, and only when the plaintiff has met a three part test by showing:  First, that the third party has suffered an injury in fact; Second, that the plaintiff has a close relation to the third party such that the plaintiff will effectively represent that party's interests;  and Third, that the third party is inhibited in its ability to protect itself. See: <u>Powers v. Ohio</u>, 499 U.S. 400, 411, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991);  <u>Duke Power Co. v. Carolina Environmental Study Group, Inc.</u>, 438 U.S. 59, 80, 98 S. Ct. 2620, 57 L. Ed. 2d 595 (1978); <u>Levy v. Alfano, et al</u>, 47 F. Supp. 2d 488, 493 (S.D. N.Y. 1999).

**3.    <u>Substantive Due Process</u>**

"Substantive due process may be roughly defined as the constitutional guaranty that no person shall be deprived of his life, liberty, or property for arbitrary

reasons, such a deprivation being constitutionally supportable only if the conduct from which the deprivation flows is proscribed by reasonable legislation (that is, legislation the enactment of which is within the scope of legislative authority) reasonably applied (that is, for a purpose consonant with the purpose of the legislation itself). . . It has been said that protection from arbitrary action is the essence of substantive due process, and similarly, that, in substantive law, due process may be characterized as a standard of reasonableness which is similar to the standard or test of 'rational grounds' used in determining a claim of unequal protection of the laws."  16A Am Jur 2d, <u>Constitution Law</u>, §816.

The Due Process Clause generally secures persons from the abusive exercise of government power;  it imposes no affirmative duty on the government to guarantee a minimal level of safety or well-being, except in cases of a special relationship or state-created danger.  <u>DeShaney v. Winnebago County Dep't of Social Servs.</u>, 489 U.S. 189, 196-97, 103 L. Ed. 2d 249, 109 S. Ct. 998 (1989);  <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 126-27, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992).

The Supreme Court, in <u>Washington, et al v. Glucksberg, et al</u>, 521 U.S. 702, 719-721, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997) discussed the parameters of substantive due process in this case which reviewed the State of Washington's statute banning the right to physician assisted suicide.  The court stated that the "Due Process Clause guarantees more than fair process, and the liberty it protects includes

more than the absence of physical restraint. (Due Process Clause protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them.) . . . The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interest. . . In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the liberty specifically protected by the Due Process Clause includes the rights to marry, to have children . . . ; to direct the education and upbringing of one's children . . . ; to marital privacy . . . ;  to use contraception . . . ;  to bodily integrity . . . ;  and to abortion . . . We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment.

But we have always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. . . By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action.  We must therefore exercise the utmost care whenever we are asked to break new ground in this field . . . lest the liberty protected by the Due Process Cause be subtly transformed into the policy preferences of the members of this Court.

Our established method of substantive-due-process analysis has two primary features:  First, we have regularly observed that the Due Process Clause specifically protects those fundamental right and liberties which are, objectively, deeply rooted in this Nation's history and tradition. . . (so rooted in the traditions and conscience of our people as to be ranked as fundamental), and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. . .  Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest . . .  Our Nation's history, legal traditions, and practices thus provide the crucial guidepost for responsible decisionmaking . . . that direct and restrain our exposition of the Due Process Clause. . .  The Fourteenth Amendment forbids the government to infringe . . . 'fundamental' liberty interest at *all*, no matter what process is provided, unless the infringement is narrowly tailored to served a compelling state interest."   (Internal citations, quotation marks and punctuation omitted.)

In Nicholson, et al v. Scoppetta, et al, 334 F.3d 154, 173-174 (2d Cir. 2003) the court stated that: "We have offered many formulations of the test of substantive due process, not all of them entirely consistent with one another.  For example, in determining the exactingness of our review, we have distinguished between challenges to government legislation or regulation and the specific act of a governmental officer . . . Thus, we assume that we would uphold the government's

actions where case workers have a reasonable basis for their findings." (Internal quotation marks and citations omitted.)

In <u>Nicholson</u>, supra, the court reviewed New York's statutory process for the removal of children from the parents and certified the question to New York's highest appellate court.

The court held, in <u>Siegert v. Gilley</u>, 500 U.S. 226, 234, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991) that damage to reputation, even if coupled with impairment of future employment prospects, was not alone sufficient to establish a due process violation.

### 4.    **Federal Governmental Immunity**

According to the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 73 L. Ed, 2d 396, 102 S. Ct. 2727 (1982).

"Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial lawsuits. Government actors performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.  Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act.  The objective reasonableness test is met and the defendant is entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the defendant's actions."  Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995) (citations and internal quotation marks omitted).

Qualified immunity involves a two-step inquiry.  First, the court considers whether "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right."  Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001).  If the court finds a constitutional violation has been demonstrated, it must then consider whether the violation involved clearly established constitutional rights of which a reasonable person would have known.

The qualified immunity doctrine balances the need to protect the rights of citizens through damage remedies, with the opposing need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.  Danahy v. Buscaglia, 134 F.3d 1185, 1189