(2d Cir. 1998) (quoting <u>Butz v. Economou</u>, 438 U.S. 478, 506, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978).

"[Q]ualified immunity protects government officials from liability for civil damages if the challenged action does not violate clearly established statutory or constitutional rights of which a reasonable person would have know." <u>Danahz v. Buscaglia</u>, 134 F.3d 1185, 1190 (2d Cir. 1998) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). "A right is clearly established when the contours of the rights are sufficiently clear that a reasonable official would understand that what he is doing violates that right. The unlawfulness must be apparent." <u>McEvoy v. Spencer</u>, 124 F.3d 92, 96 (2d Cir. 1997) (quoting <u>Andersons v. Creighton</u>, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). See also: <u>Saucier v. Katz</u>, 533 U.S. at 202. For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Russo v. City of Cincinnati</u>, 953 F.2d 1036, 1042 (6th Cir. 1992); <u>Anderson v. Creighton</u>, 483 U.S. 635, 639, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987). "Although it need not be the case that 'the very action in question has been previously held unlawful . . . in the light of pre-existing law the unlawfulness must be apparent.' " <u>Id</u>. (quoting <u>Anderson</u>, 483 U.S. at 640).

In <u>Lennon v. Miller</u>, 66 F.3d at 421, the court "recognized the apparent anomaly of holding that summary judgment is appropriate when a trier of fact would

find that reasonable officers could disagree." Id, at 421.  The court went on to state

that "in qualified immunity cases, we are not concerned with the correctness of the

defendants' conduct, but rather the 'objective reasonableness' of their chosen course

of action." Id.  See also: Brogdon v. City of New Rochelle, 200 F. Supp. 2d 411, 424

(S.D. N.Y. 2002).  ("On a motion for summary judgment, the issue is whether a

reasonable police officer would have known that what he was doing was clearly illegal

based on the facts before him.")  Because one of the articulated purposes of qualified

immunity is to prevent "fear of personal monetary liability and harassing litigation"

from interfering with government officials' duties, "the identification and disposal of

insubstantial claims by summary judgment is encouraged." Lee v. Sandberg, 136

F.3d 94, 101-02 (2d Cir. 1997) (quoting Anderson v. Creighton, 483 U.S. 635, 107 S.

Ct. 3034, 638, 97 L. Ed. 2d 523 (1987) (internal quotation marks omitted).  See also:

Mitchell v. Forsyth, 472 U.S. 511, 526, 104 S. Ct. 2806, 86 L. Ed. 2d 411 (1985) (the

qualified immunity entitlement is an "immunity from suit rather than a mere defense to

liability . . . [it] is effectively lost if a case is erroneously permitted to go to trial.").

## 5.   Reporting of Child Abuse and Health Director's Duties

### (a)   Statutory Immunity

Connecticut General Statutes §17a-101 et seq. is part of Connecticut's

strong public policy designed to protect children's health and welfare from injury and

neglect.  The statutes require that certain classes of individuals report the abuse of

children to the Connecticut Department of Children and Family Services (the "DCF") or to the local police. The statutes also provide for a penal fine of a mandated reporter for failure to report abuse, as well as statutory immunity for making such report.

Connecticut General Statute §17a-101(a) provides, in part, that "the public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect . . . ; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provisions of services, where needed, to such child and family."

Subsection (b) of this statutory section sets forth the persons who are "mandated reporters," ranging from physicians, dentists and teachers to sexual assault counselors.

Connecticut General Statute §17a-101a requires that physicians and other mandated reporters listed in Connecticut General Statute §17a-101(b), who have reasonable cause to suspect or believe that any child under the age of eighteen years has been abused or has had non-accidental physical injury inflected upon him by a person responsible for such child's health, welfare or care or is placed at imminent risk of serious harm by an act or failure to act on the part of such responsible person, or has been neglected, shall report to the Department of Children and Family

Services.    This statutory section also sets forth a maximum five hundred dollar penalty for failure to make such report.

Connecticut General Statute §46b-120(8), which is incorporated by reference into Connecticut General Statute §17a-101a, provides that a child or youth may be found neglected who (A) has been abandoned or (b) is being denied proper care and attention, physically, educationally, emotionally or morally or (C) is being permitted to live under conditions, circumstances or associations injurious to his well-being, or (D) has been abused.

Connecticut General Statute §17a-101b provides, in pertinent part, that "an oral report shall be made by a mandated reporter within twenty-four hours of suspecting or believing that a child has been abused or neglected by telephone or in person to the Commissioner of Children and Families or a law enforcement agency."

Connecticut General Statute §17a-101e provides, in pertinent part, that "any person, institution or agency which, in good faith, makes . . . the report pursuant to sections 17a-101a to 17a-101d . . . shall be immune from any liability, civil or criminal, which might otherwise be incurred or imposed . . ."

Connecticut General Statute §17a-101k provides, in relevant part, that "the information contained in the reports and any other information relative to child abuse, wherever located, shall be confidential subject to such regulations governing their use and access as shall conform to the requirements of federal law or regulations. . ."

The "confidentiality requirements are likely designed to protect the accused abuser . . ." Ward v. Kathy Greene, et al, 267 Conn. 539, 554, 839 A.2d 1259 (2004).

Under the statutory scheme set out in Connecticut General Statute §17a-101 et seq., mandated reporters who have "reasonable cause to suspect or believe" child abuse are obliged to report their suspicion or belief to the Commissioner of Children and Families or to a law enforcement agency.   Mandated reporters include physicians.  Connecticut General Statutes §§ 17a-101(b), 17a-101a, 17a-101b, 17a-101c. "General Statutes §17a-101(a) establishes the public policy of the state.  That public policy, in part, is to 'protect children whose health and welfare may be adversely affected through injury and neglect . . .'  To implement that purpose, the state's policy is 'to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed to such child and family.' "  Sarah M.S. v. Department of Children & Families, 49 Conn. App. 663, 668, 714 A.2d 1284 (1998).  See also: Sealed v. Sealed, 332 F.3d 51 (2d Cir. 2003) (appeal from D. Conn.).  "By its terms, §17a-101(a) connotes a responsibility on the state's behalf to act before the actual occurrence of injury or neglect has taken place."  In re Michael D., 58 Conn. App. 119, 123-24, 752 A.2d 1135, cert. denied, 254 Conn. 911, 759 A.2d 505 (2000).  The legislature's "strong public policy of encouraging medical professionals and other persons to report actual and suspected child abuse to the appropriate authorities and agencies."  Zamstein v. Marvasti, 240

Conn. 549, 559, 692 A.2d 781 (1997), is reflect in the immunity from liability it conferred in General Statutes §17a-101e which provides, in pertinent part, that "any person, institution or agency which, in good faith, makes . . . the report pursuant to sections 17a-101a to 17a-101d . . . shall be immune from any liability, civil or criminal, which might otherwise be incurred or imposed . . ."

"In common usage, the term good faith has a well defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation." "It is a subjective standard of honest of fact in the conduct or transaction concerned taking into account the person's state of mind, actual knowledge and motives. Whether good faith exists is a question of fact to be determined from all of the circumstances." (Internal quotation marks omitted.) Kendzierski v. Goodson, 21 Conn. App. 424, 574 A.2d 249 (1990).

The Defendants' Doctor and Director of Health had no obligation to conduct an independent investigation of their concerns. See Zamstein v. Marvasti, supra, 240 Conn. at 549; Morales v. Kagel, supra, 58 Conn. App. at 776. Rather, it was the obligation of the state, through DCF, to determine the nature and scope of the investigation which the reported facts required so it could fulfill its responsibility to act to prevent the actual occurrence of injury or neglect. See: Sarah M.S. v. Department of Children & Families, supra, 49 Conn. App. at 668. See also: Morales v. Kogel, 58

Conn. App. 776, 755 A.2d 915 (2000) (mandated reporter did not have a duty to investigate allegations prior to making good faith report).

### (b)    Health Director

Connecticut General Statute §7-148(c)(7)(H)(xi) grants broad municipal police powers to "provide for the health of the inhabitants of the municipality and do all things necessary or desirable to secure and promote the public health." In <u>Modern Cigarette, Inc. v. Orange, et al</u>, 256 Conn. 105, 122, 774 A.2d 969 (2001), the court upheld the Town of Orange's municipal ordinance forbidding cigarette machines. The court based that holding, in part, on broad statutory mandate of §7-148(c)(7)(H)(xi). The court stated that "the statutory scheme of this legislation envisages its adaptation to infinitely variable conditions for the effectuation of the purposes of these statutes."

Connecticut General Statutes §§19a-200 through 19a-231 relates to the duties and the jurisdiction of municipal directors of health. The municipal director of health's primary duty is to protect the public health from filth and nuisance (Connecticut General Statute §19a-206). To that end, the municipal director of health may: enforce the State of Connecticut Public Health Code, which includes regulation of retail food establishments (§19a-36); adopt regulation and enforce the State Public Health Code (§19a-207); order the removal of refuse (§19a-210); order public toilets be kept in a sanitary condition (§19a-211); order abatement of nuisances arising from swampy lands; order abatement of mosquito-breeding placed (§19a-213); suspend

deliver of fuel oil and bottled gas to retail residence (§19a-214);  examination and treatment of minor for venereal disease (§19a-216);  examination and treatment of people with communicable disease (§19a-216a);  prevention of blindness in newborn infants (§19a-219);  enforcement of health authorities orders (§19a-220);  order quarantine of individuals who are infected by certain communicable disease (§19a-221);  adopt measures for vaccination (§19a-222);  regulate unloading and transportation of certain fertilizers (§19a-226);  regulate anchorage of houseboats (§19a-227, §19a-228);  inspection of barbershop and beauty salons (§19a-231);  and issue fines for violation of health director's orders (§19-230).

### (c)    Governmental Immunity

Both Health Director Gecewicz and Dr. Boukhalil are entitled to qualified governmental immunity for reporting what they considered an inappropriate environment for a small child.

The doctrine of qualified government immunity "strikes a balance between the need, on one hand, to hold responsible public official exercising their power in a wholly unjustified manner and, on the other hand, to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury." Locurto v. Safir, 264 F.3d 154, 162-63 (2d Cir. 2001) (internal quotation marks omitted).

Here those individuals found a three/four year old child in a strip club where illicit drugs were bought and sold as well as where prostitution was carried out. That child asked them inappropriate questions regarding their preference regarding a woman's breasts and genital area.

Those municipal officials had a statutory and common law duty to protect the welfare of the child. They exercised that duty, in good faith, by reporting their observations and concerns to the Department of Family and Children. It is that Department that has the statutory duty to investigate those observations and concerns.

### 6.    Connecticut Liquor Control Act

The State of Connecticut regulates the sale, transportation and possession of intoxicating liquor in Connecticut General Statutes, Title 30, §§ 30-1 through 30-115. Connecticut's statutory scheme in the regulation of intoxicating liquor is to have forty-six (46)[1] different classes of permits dependant upon the type of business, as well as licensing of individuals who carry out that business.

The types of business are diverse, ranging from manufacturers to wholesalers to retailers who sell intoxicating liquors for consumption off premises, as well as consumption on premises.

---

[1] **End Note**

The legislative plan for the enforcement of the Liquor Control Act is to utilize local and state police in addition to the department's own agents. Connecticut General Statute §30-104 provides, in relevant part, that "The Department of Consumer Protection, its agents and any member of any organized police department in any town, city or borough, and any state policeman, may, at any time, enter upon the premises of any permittee to ascertain the manner in which such person conducts business and to preserve order."

### 7.    **Mental Distress**

Judge Burns, in <u>Scott v. Town of Monroe, et al</u>, 306 F Supp. 2d 191, 198-199 (D. Conn. 2004), set forth the standard for intentional as well as for negligent infliction of mental distress.

"In order to assert a claim for intentional infliction of emotional distress, the plaintiff must establish four elements: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the distress suffered by the plaintiff was severe. <u>Petyan v. Ellis</u>, 200 Conn. 243, 253, 510 A.2d 1337 (1986).

Whether the defendant's conduct is sufficient to satisfy the element of extreme and outrageous conduct is a question, in the first instance, for the Court. Johnson v. Chesebrough-Pond's USA Co, 918 F. Supp. 543, 552 (D. Conn. 1996) aff'd 104 F.3d 355 (2d Cir. 1996). Only where reasonable minds would differ, does it become a question for the jury. Id. (citing Reed v. Signode Corp., 652 F. Supp. 129, 137 (D. Conn. 1986). See also 1 Restatement (Second) of Torts §46, comment (h). The general rule is that there is liability for conduct exceeding all bounds usually tolerated by a decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind. Johnson, 918 F. Supp. at 552 quoting Mellaly v. Eastman Kodak Co., 42 Conn. Supp. 17, 19-20, 597 A.2d 846 (Conn. Super. 1991). See also 1 Restatement (Second) at comment (d)) (Conduct must be so outrageous and extreme . . . as to go beyond all possible grounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.)

In order to establish a cause of action for negligent infliction of emotional distress, the plaintiff must prove that defendant should have: (1) realized that its conduct involved an unreasonable risk of causing distress to plaintiff; and (2) realized that the distress, if caused, might result in illness or bodily harm. See Barrett v.

Danbury Hospital, 232 Conn. 242, 260-61, 654 A.2d 748 (1995)." (internal punctuation omitted.)

In accord, see Appleton v. Board of Education, 254 Conn. 205, 210, 757 A.2d 1059 (2000), which stated that in "order for the plaintiff to prevail in a case for liability under . . . international infliction of emotional distress, four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Internal quotation marks omitted.)

"All four elements must be established to prevail on a claim for intentional infliction of emotional distress." Muniz v. Kravis, 59 Conn. App. 704, 708-09, 757 A.2d 1207 (2000). "**Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine.**" (Emphasis added.) Bell v. Board of Education, 55 Conn. App. 400, 410, 739 A.2d 321 (1999). Only where reasonable minds disagree does it become and issue for the jury. Appleton v. Board of Education. 264 Conn. at 210.

"Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society. . . Liability has been found

only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous' . . . Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citation omitted;  internal quotation marks omitted.) Appleton v. Board of Education, 254 Conn. 210-11.

The Defendants, Gecewicz and Dr. Boukhalil, notified the State Department of Children and Families, as mandated reporters, regarding a situation which they felt was not a proper environment for a three/four year old child, to wit sitting at the bar of a strip club as well as having free access to the strippers' dressing room and mingling with nude strippers (Exhibit 2 - Affidavit of Gecewicz;  Exhibit 3 - Affidavit of Dr. Boukhalil;  See also Exhibit 5, page 67, lines 14-21 - Deposition of Pagliuco where he admits that it was not a proper environment for his son).  Making the report did not meet the standard for an intentional infliction of mental distress which is that it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterably intolerable in a civilized community." Appleton, supra, 254 Conn. at 210.

There must be some injury for either an intentional or negligent infliction of emotional distress. The Plaintiff made a conclusory claim of emotional distress but did not allege any facts to show any injury.

The Plaintiff never sought medical and/or psychological treatment regarding his alleged emotional distress. He has not divulged an expert regarding the alleged emotional distress (Exhibit 5, page 67, lines 3-13). In Aspiazu v. Orgera, 205 Conn. 623. 630, 535 A.2d 338 (1987) the court stated that "[e]xpert testimony is often used to establish the existence, extent or cause of an injury or disease.   . . . Under some circumstances, this court has held that expert testimony is required to establish causation." (Internal citations omitted)

## 8.    Monell §1983 Claim

A Monell §1983 claim against a municipality is for an alleged constitutional deprivation that was made pursuant to a policy or custom of the municipality. See Monell v. Dept. of Social Services, 436 U.S. 658, 690-691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). A municipality has no liability for alleged §1983 violations under the theory of respondeat superior. Monell, Id. 436 U.S. at 694; Clue of Johnson, 179 F.3d 57, 62 (2d Cir. 1999).

The court, in Amnest America v. West Hartford, 361 F.3d 113 (2d Cir. 2004) stated that: "more often than no . . . plaintiffs allege constitutional deprivations at the hands of the lower-level municipal employees to whom some authority has been

delegated, rather than at the hands of those officials with final policymaking authority."

Since §1983 does not permit liability pursuant to respondeat superior, a plaintiff

asserting such a claim must "prove that 'the authorized policymakers approved a

subordinate's decision and the basis for it.' " City of St. Louis v. Praprotnik, 485 U.S.

112, 127, 108 S. Ct. 915, 99 l. Ed. 2d 107 (1988) (plurality opinion).

### 9.    **Connecticut Constitution**

Article 1 §1 of Connecticut's Constitution states:  "All men when they form a

social compact, are equal in rights;  and no man or set of men are entitled to

exclusive public emoluments or privileges from the community."

This constitutional provision has a like meaning as the Fourteenth Amendment

to the federal constitution.  Barnes v. New Haven, 140 Conn. 8, 98 A.2d 523 (1953).

Article 1 §20 of Connecticut's Constitution states:  "No person shall be denied

the equal protection of the law nor be subjected to segregation or discrimination in the

exercise or employment of his or her civil or political rights because of religion, race,

color, ancestry, national origin, sex or physical or mental disability."

The equal protection and due process clauses of Connecticut's Constitution

have the same meanings and limits as the United States Constitution.  Brunswick

Corp. v. Liquor Control Commissioner, 184 Conn. 75, 440 A.2d 792 (1981).

## 10.    Use and Occupancy Payments

When a tenant fails to pay rent when due, the landlord may terminate the rental agreement after nine days have passed (Connecticut General Statute §47a-15a). Thereafter, the statutory summary process begins for the eviction of the tenant by serving a notice to quit (Connecticut General Statute §47a-23). If the tenant does not vacate the premises, the landlord would file and serve a complaint (Connecticut General Statute §47a-23a). The landlord, during the pendency of the summary process action, may request use and occupancy payments (Connecticut General Statute §47a-26b). After a hearing and if there is a ruling in favor of the landlord (Connecticut General Statute §47a-26d), the tenant may receive a stay in order to appeal (Connecticut General Statute §47a-26g and §47a-35). Eviction of the tenant would be the end result of the process (Connecticut General Statute §47a-42).

Connecticut General Statute §52-91 sets forth the form of the complaint. Connecticut General Statute §52-97 provides for the unity of legal and equitable causes of action including the recovery of rents. Connecticut General Statute §52-136 provides for the joinder of action in contract and in tort which are subject to the cause of action.

In Southington '84 Associates v. Silver Dollar Stores, Inc., et al, 237 Conn. 758, 678 A.2d 968 (1996) the court upheld the landlords action for back and future rent brought pursuant to Connecticut General Statute §52-91.

The City of Bridgeport maintains that the Plaintiffs were unjustly enriched by remaining in possession of the premises and refusing to pay rent and/or use and occupancy fees.

Unjust enrichment is a legal doctrine to be applied when no remedy is available pursuant to contract. 5. Williston, Contracts (Rev. Ed.) §1479. Recovery for unjust enrichment is appropriate when a defendant retains a benefit that has come to him at the expense of another. Polverari v. Peatt, 29 Conn. App. 191, 614 A.2d 484, cert. denied, 224 Conn. 913, 617 A.2d 166 (1992);  see National CSS, Inc. v. Stamford, 195 Conn. 587, 597, 489 A.2d 1034 (1985);  Schleicher v. Schleicher, 120 Conn. 528, 534, 182 A.2d 162 (1935).

The elements of unjust enrichment are well established.  Plaintiffs seeking recovery for unjust enrichment must prove "(1) that the defendants were benefits, (2) that the defendants unjustly did not pay the plaintiffs for the benefit, and (3) that the failure of payment was to the plaintiffs' detriment." Bolmer v. Kocet, 6 Conn. App. 595, 612-13, 507 A.2d 129 (1986).

In this matter the City took title to the subject real property located at 2284, 2288, 2290 and 2294 Fairfield Avenue, Bridgeport, Connecticut on October 15, 1998 by way of strict foreclosure of delinquent real property taxes.  The City instituted eviction proceedings on the Plaintiff on February 5, 1999 by serving a Notice to Quite on the Plaintiffs.  The City served and filed a complaint seeking possession of the

premises.  Thereafter, the City sought use and occupancy payments, but the court did not grant such payments.  The City received judgment of possession which the Plaintiffs appealed in <u>Bridgeport v. 2284 Corporation</u>, 63 Conn. App. 624 (2001).  The Plaintiffs were evicted on September 23, 2001.

Prior to the City taking title to the subject premises on October 15, 1998, the Plaintiffs were tenants of a Joseph Voll.  Under the lease, the Plaintiffs paid Joseph Voll a month lease payment of $2,200.00.  During the thirty six (36) month time period from October 15, 1998 to September 23, 2001, the Plaintiffs did not make any payment of rent and/or use and occupancy payments to the City of Bridgeport.  The Plaintiff, Louis Pagliuco, through his attorney, offered to make such payments if the City entered into a lease with him.

The fair rental value of the premises is $2,200.00 monthly, which was the amount the Plaintiffs paid to the previous landlord, Joseph Voll.  The number of months due and owing are thirty six (November, December, 1998;  1999;  2000; January through October, 2001).  The amount due and owing is Seventy Nine Thousand Two Hundred Dollars ($79,200.00).

### 11.   <u>Equal Protection Claim Against Lt. Sapiro</u>

#### (a)   **Equal Protection**

The Plaintiff brought an equal protection claim against Lt. Sapiro alleging disparate enforcement of Connecticut's Liquor Control Act.  That Act, at

Connecticut General Statute §30-105, authorizes local and state police to enter the premises where alcoholic beverages are sold to ascertain the manner in which business is conducted.

The Defendants incorporate their previous discussion in Parts D2 (Equal Protection and Standing), D4 (Governmental Immunity ), and D6 (Connecticut Liquor Control Act), supra.

The Plaintiff must allege and prove that he was similarly situated to the other named businesses in the Complaint, Paragraph 13. He must also prove that the selective treatment was motivated by an impermissible consideration such as here the race of his patrons.

The Defendants maintain that the Plaintiff was not similarly situated to the thirteen named businesses (Complaint, Paragraph 12). All but one of these businesses have one of the different classes of permit to sell liquor and/or beer and wine.

Ruby's 2 (Complaint, Paragraph 12.1) is the only establishment that offers adult entertainment, but it does not have a liquor permit; therefore, Connecticut General Statute §30-106 is not applicable. The remainder of those businesses are either family restaurants, such as Black Rock Castle, Kossuth Club, Taco Loco and the Tool House Restaurant, or bars and clubs that offer meals and may offer entertainment such as bands. They are not strip clubs such as the Plaintiffs, nor is

prostitution and the sale of drugs carried out in those establishments as was openly carried on at Dangerous Curves.

Dangerous Curves is not similarly situated to the named establishments in Paragraph 12. To be similarly situated, those businesses must be similarly situated in all material respects. The fact that all but one possess one of the forty-six (46) different classes of liquor permits is irrelevant. Connecticut issues its permits based on the type of business that is carried out, ranging from manufacturer to grocery store. Connecticut charges annual fees for those permits ranging from a high of $2,000.00 to a low of $15.00.

The Plaintiff goes on to compare himself to four other strip clubs, as set forth in Paragraph 12 (Complaint). The State of Connecticut instituted public nuisance complaints to close two of those strip clubs, the Keystone Café and Teddie's Café. They are charged with carrying on prostitution.

### (b)    Standing

The Plaintiff also fails to meet the second prong of the test that the selective treatment was motivated by an impermissible consideration such as race. The Plaintiff alleged that the inspections were based on the fact that a majority of his clientele was African American. He lacks standing to represent third parties equal protection claims. First, he must allege and prove that his African American customers have suffered an injury. The Plaintiff has not alleged that fact, nor can he

prove such an injury. Second, the Plaintiff must allege and prove that he has such a close relationship with his customers that he can effectively represent their interest. he did not have a close personal relationship with those customers. He did not even know their names. The third part of the test is that his African American customers are inhibited in their ability to protect themselves. The Plaintiff has not alleged or proved that fact.

The Plaintiff's equal protection claim must fail because he has failed to meet the test to enforce those claims. He was not similarly situated, nor has he shown an infringement on his own constitutionally protected interest.

### (c)    Governmental Immunity

The Defendant Sapiro is also entitled to qualified governmental immunity for his inspections of Dangerous Curves. Lt. Sapiro incorporates, by reference, Part D4 (Governmental Immunity) and Part D6 (Connecticut Liquor Control Act) in this section.

For qualified governmental immunity, it must have been objectively reasonable for Lt. Sapiro to believe that it was lawful for him to make inspections of the Dangerous Curves strip club pursuant to Connecticut General Statute §30-106 which authorized local police officers to inspect the premises of businesses holding an alcoholic beverage permit. The constitutionality of that statutory section has not been

challenged by the Plaintiff. There has been no allegation or proof presented by the Plaintiff as to the unlawfulness of such inspection.

During roughly a three year time frame the Plaintiff was subject to municipal and state supervision and intervention. Lt. Sapiro (formerly Sergeant) was the supervisor of the MOST detail from August, 1998 through November, 2000. Included in the duties of the MOST detail was the supervision of on and off premises liquor establishments, including the Plaintiff's.

The MOST detail made approximately eleven (11) inspections of the Plaintiff Dangerous Curves Strip Club during a two (2) year time period and made a number of arrests. The charges included underage dancers and the display of exposed breasts and genitals. The detail found alleged drugs, used condoms on the floor, and dancers mingling with patrons. Further, the dancers would perform "lap dances" on patrons in two booths with beaded curtains. The Plaintiff, Pagliuco, would charge either $5.00 (Exhibit 5, page 56, lines 2-8 - Testimony of Pagliuco) or $20,00 (Exhibit 1 - Sapiro Affidavit).

In the years 1999-2000 the Plaintiff was subject to an action brought by the Liquor Division of the Department of Consumer Protection, State of Connecticut, for a number of violations of State statutes and State regulations; to wit, Connecticut General Statutes §30-54 and §30-86; and Regulations of Connecticut State Agencies

§30-6-A12, §30-6-23a, §30-6-A23(a)(1), and §30-6-A24(d) & (e). The statutory and regulatory sections are fully set forth as exhibits.

In order to resolve the charges brought against him, the Plaintiff entered into an "Offer In Compromise" with an offer date of January 30, 2001. The Plaintiff agreed to pay a penalty of $10,000.00 and to a 45-day closure of his business (Exhibit 6 - Offer In Compromise; Pagliuco Deposition, Exhibit 5, page 32, lines 19-25, page 33, lines 1-6).

Between December 19, 2000 and February 15, 2001, members of the Statewide Cooperative Crime Control Task Force went to Dangerous Curves Café on no fewer than seventeen (17) separate occasions to investigate illegal activity occurring within the premises. This illegal activity resulted in the issuance of eighteen (18) arrest warrants for eleven (11) different individuals, various drug offenses, and prostitution (paragraph 14) (Exhibit 1 - Sapiro Affidavit; Exhibit 8 Complaint, State of Connecticut).

On or about February 13, 2001, the Office of the Chief States Attorney, on behalf of the State of Connecticut, brought a civil nuisance abatement action against Louis Pagliuco, Louis Paliuco d/b/a Dangerous Curves Café, the Real Property and Premises known as 2294 Fairfield Avenue, Bridgeport, Connecticut a/k/a Dangerous Curves Café. That action was brought pursuant to Connecticut General Statute §19a-343, et seq. The complaint alleged, in part, that the real property was "a known

narcotics trafficking area within which illicit drugs can be purchased openly and on a daily basis."   (paragraph 9);   and that "property was known for prostitutions." (paragraph 10).

On or about May 14, 2001, the State received judgment based on an April 9, 2000 stipulation wherein Pagliuco agreed that no illegal drugs or prostitution would be permitted on the premises.  Pagliuco also agreed to a number of additional conditions relating to the conduct of his business.

Governmental officials, such as police officers performing discretionary functions, are entitled to qualified immunity insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L, Ed. 2d 396 (1982), or insofar as "it[is} objectively reasonable for them to believe that their acts d[o] not violate those rights." Velardi v. Walsh, 40 F.3d 569, 573 (2d Cir. 1994).  A determination of whether a defendant is entitled to qualified immunity, which is an entitlement not to stand trial or face the other burdens of litigation, "shold be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." Saucier v. Katz, 533 U.S. 194, 200, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

The inquiry whether the facts alleged show that Lt. Sapiro's conduct violated a constitutional right must be "undertaken in the specific context of the case, not as a

broad general proposition." <u>Saucier</u>, 533 U.S. at 201. Lt. Sapiro's MOST detail conducted statutorily sanctioned inspections of the Plaintiff's premises. During those inspections the detail found violations of various State statutes and regulations. The detail also found evidence of prostitution and illegal drug trafficking.

The Liquor Division found a number of violations of State statutes and State regulations, including the full display of strip dancers breasts and genitalia. The Plaintiff, in effect, pled out to those charges when he entered into the Offer in Compromise.

The Statewide Cooperative Crime Task Force conducted an investigation and made a number of arrest for illegal drug trafficking and prostitution.

The Chief States Attorney's Office brought a civil action against the Plaintiff to abate the nuisance carried out in the Plaintiff's strip club, to wit, the trafficking of illegal drugs and prostitution. The Plaintiff entered into a stipulated judgment, in effect pleading out to those charges. The Stipulated Judgment and Offer in Compromise that the Plaintiff entered into are similar to the Alford Doctrine where, in a criminal case, an accused does not plead guilty, but agrees to waive trial and accept his sentence. See: <u>North Crolina v. Alford</u>, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). Here, the Plaintiff has accepted the finding and judgment of the Liquor Division and the Superior Court.

Lt. Sapiro had every reason to believe that it was lawful for him to make the inspections. That is buttressed by the subsequent investigation and arrests by the State Cooperative Crime Task Force, the Administrative action and decision by the Liquor Division, and the Superior Court action brought by the States Attorney's Office and subsequent stipulated judgment. The actions brought by the various State agencies were not brought because of an improper purpose, but were brought because of the unlawful conduct of the Plaintiff's business. The same is true of the inspections of the Plaintiff's business by the MOSt detail. Those inspections were carried out because of the ongoing violations of State statutes and State regulations.

The Plaintiff's suit regarding Lt. Sapiro must fail because he has qualified governmental immunity, as well as the Plaintiff's failure to allege and prove an equal protection violation of his constitutional rights.

## 12. <u>Substantive Due Process Claims against Thomas Gecewicz and Dr. Josette Boukhalil</u>

### (a) Substantive Due Process, Statutory Immunity, Governmental Immunity

The Plaintiffs made a conclusory claim that their federal constitutional substantive due process rights, as well as their rights guaranteed by Article First, Sections 1 and 20 of Connecticut's Constitution, had been violated.

Parts D3 (Substantive Due Process), D4 (Governmental Immunity), D5 (Reporting of Child Abuse and Health Director's Duty), and D9 (Connecticut Constitution) supra, are incorporated herein.

The State guarantees are treated the same as the federal substantive due process guarantees.

Substantive due process related "to those fundamental rights and liberties which are objectively rooted in this Nation's history and tradition." Washington, et al v. Glucksberg, et al, supra, 521 U.S. at 720-721 (Part D3 supra).

The facts in this matter do not rise to that constitutional level.

The State of Connecticut, as "parents patriae, has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare. The parents, as natural guardians, are responsible to the state for the child's well-being. The natural rights of a parent to the custody and control of his infant child are subject to the power of the state, and may be restricted and regulated by appropriate legislative or judicial action."    59 Am Jur 2d, Parents and Child, §, citing, in part, Prince v. Massachusetts, 321 U.S. 158, 645 S. Ct. 438, 88 L. Ed. 645 (1944); Stanley v. Illinois, 405 U.S. 645, 92 S. Ct. 1238, 31 L. Ed. 2d 551 (1972). To that end, the state enacted Connecticut General Statute §17a-101 et seq. in order to protect children.

## END NOTE

There are forty-six (46) different types of liquor business permits issued by the State of Connecticut. See:

Manufacturers permit (§30-16) - annual fee:  full $1,600;  beer $160;  apple brandy $320;  cider $160;  winery $140

Wholesaler permit (§30-17) – annual fee:  $2,000

Out-of-State shippers permit (§30-18) – annual fee:  Connecticut manufacturers $45; others $1,000

Out-of-State Small Winery Shippers permit (§30-13a) – annual fee: $250

Out-of-State Beer Shippers permit (§30-19) – annual fee:  Connecticut shippers $$45; Others $1,000

In-State Transporters permit (§30-19) – annual fee:  $1,000

Package Store permit (§30-20) – annual fee:  $400

Grocery Store Beer permit (§30-20) – annual fee:  $80

University permit (§30-20a) – annual fee:  $560

Hotel permit (§30-21) – annual fee:  $240

Resort permit (§30-21) – annual fee:  $1,250

Restaurant permit (§30-22) – annual fee:  full $1,200;  beer & wine only $500; Beer only $240

Café permit (§30-22a) – annual fee:  $1,700 (have food such as "sandwiches, soups or other food, whether fresh, processed, precooked or frozen" available for sale)

Restaurant permit for catering establishment (§30-22b) – annual fee $1,200

Juice Bar permit (§30-22c) – no annual fee

JBF05019

Club permit (§30-23) – annual fee $240 (an association of persons in a fraternal or social organization, sale of alcoholic liquor to members and guests)

Club permit for Rocky Hill Veterans Home & Hospital (§30-23b) – pay applicable fees

Golf Club permit (§30-24a) – annual fee $800

Special Club permit for Picnics (§30-25) – daily fee $25

Golf Club permit in no-permit town (§30-25a)

Tavern permit (§30-26) – annual fee $240 (sale of beer and wine, with or without food)

Railroad permit (§30-28) – annual fee $400 (sale of alcoholic liquor on railroad train)

Airline permit (§30-28a) – annual fee $400 (sale of alcoholic liquor in flight)

Boat permit (§30-29) – annual fee $400

Warehouse permit (§30-22) – annual fee $160 (storage in bonded warehouse)

Concession permit (§30-33) – annual fee $240;  six month fee $160; daily fee $25 (sale of beer and wine at fair grounds, ball parks, amphitheater, etc.)

Coliseum permit (§30-33a) – annual fee $2,000

Coliseum Concession permit (§30-33a) – annual fee $1,000

Special Sporting Facility permit (§30-33b) – annual fee $1,200 (racing or jai-alai)

Special Outing Facility permit (§30-33c) – annual fee $1,200; beer only $240) private parties, banquet hall)

Temporary permit for non-profit outings (§30-35) – daily fee:  full $25;  beer only $15 (picnics or social gatherings)

Nonprofit Theater permit (§30-35a) – annual fee $200

Ninety-day Provisional permit (§30-35b) – fee $500

Druggist permit (§30-36) – annual fee $400

Nonprofit Public Museum permit (§30-37a) – annual fee $200

Charitable Organization permit (§30-37b) – annual fee $25

Bowling Establishment permit (§30-37c) – annual fee $2,000;  beer only $350

Racquetball Facility permit (§30-37c) – annual fee $2,000

Nonprofit Public Television Corporation permit (§30-37d) – wine only $25

Airport Restaurant permit (§30-37e) – annual fee $300

Airport Bar permit (§30-37e) – annual fee $300

Airport Airline club (§30-37e) – annual fee $650

Airport permit (§30-37f) (State of Connecticut, owner and lessor of premises at Bradley International Airport)

Nonprofit Golf Tournament permit (§30-37g) – tournament fee $200

Nonprofit Corporation permit (§30-37h) - fund raising event fee $25

Hotel Guest Bar permit (§30-37i) – annual fee per room $50 (locked guest bar in hotel guest room)

Caterer Liquor Permit (§30-37j) – annual fee $350

Casino permit (§30-37k) – annual fee $2,400;  each guest room containing guest bar $50

THE DEFENDANTS

By: _____
John H. Barton
Associate City Attorney
OFFICE OF THE CITY ATTORNEY
999 Broad Street - 2nd Floor
Bridgeport, CT  06604
Tel: #203/576-7647
Fed. Bar #05746

## **CERTIFICATION**

This is to certify that a copy of the "Notice of Manual Filing" has been mailed, postage prepaid, on this __11__ day of __October_____, 2005, to:

**John R. Williams, Esq.
51 Elm Street, Suite 409
New Haven, CT  06510**

_____
John H. Barton