UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| LOUIS PAGLIUCO and : | |
| 2284 CORPORATION : | |
| : | |
| VS. : | NO.  3:01CV836 (WIG) |
| : | |
| CITY OF BRIDGEPORT, : | |
| JOSEPH GANIM, : | |
| THOMAS E. GECEWICZ, : | OCTOBER 30, 2005 |
| ROBERT SAPIRO and : | |
| JOSTTE BOUKAHILLALAI, M.D. : | |

**BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

This is an action pursuant to 42 U.S.C. § 1983 alleging two constitutional violations, and alleging a state law claim against two of the defendants pursuant to the court's supplementary jurisdiction, 28 U.S.C. § 1367(a).  In brief, the plaintiffs owned and operated one of the many somewhat seedy strip bars located in the City of Bridgeport.  It was business as usual for the plaintiffs until their clientele changed to predominantly African-American.  At that point, the plaintiffs' bar and the other strip bars catering to a largely African-American customer base were singled out by the defendants for treatment dramatically different from that accorded the identical strip bars in the city with a predominantly Caucasian clientele.  This disparate treatment claim is set forth as a violation of the Fourteenth Amendment's equal protection clause.

1

As a part of the campaign of harassment of the establishment once it "went black," the defendants Gecewicz and Boukahillalai filed a false complaint against the plaintiff Pagliucco with the Connecticut Department of Children and Families in which they made ludicrous claims about the alleged corruption of the plaintiff's young son.  A full DCF investigation ensued which completely exonerated Mr. Pagliucco and established that the defendants' claims were false.  Because this aspect of the harassment was so outrageous and so shocking, the plaintiff Pagliucco presses against these defendants a substantive due process claim and a state law claim for the intentional infliction of emotional distress.

The defendants have moved for summary judgment.  Although their arguments are difficult to follow, they seem to assert that: (1) the plaintiffs' comparators were not sufficiently similarly situated to Dangerous Curves to permit an equal protection claim; (2) because the asserted motivation for the disparate treatment was the race of the plaintiffs' customers, the plaintiffs lack standing to make the equal protection claim; (3) defendant Sapiro is entitled to the affirmative defense of qualified immunity, but the reasons for his supposed entitlement are not stated; (4) defendants Gecewicz and Boukahillalai did not lie in their report to DCF; (5) defendants Gecewicz and Boukahillalai are entitled to statutory state law immunity for their complaint to DCF; (6) the conduct of defendants Gecewicz and Boukahillalai was neither "extreme and outrageous" for state law purposes nor "shocking to the conscience" for substantive due

process purposes. The defendant City of Bridgeport also appears to be making a summary judgment claim as to its counterclaim against the plaintiff 2284 Corporation, for "unjust enrichment" payments. However, it is extremely vague as to its basis for asserting either entitlement to any payment at all or the amount thereof. It is conceivable that the defendants are making other arguments as well, but if so these arguments are not apparent even upon a close re-reading of their brief. Accordingly, if they are making other arguments the plaintiffs ask that they be ordered to clarify just what those arguments are so the plaintiffs can respond to them.

"The standards governing summary judgment are well-settled. Summary judgment is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits..., show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed. R. Civ. P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.

"In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant....Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002).

When the moving party "'fail[s] to fulfill its initial burden' of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, 'even if no opposing evidentiary matter is presented,' for the non-movant is not required to rebut an insufficient showing." Giannullo v. City of New York, 322 F.3d 139, 140-41 (2nd Cir. 2003), quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 158, 160 (1970). "[T]he moving party bears the ultimate burden of establishing its right to summary judgment as a matter of law even when it does not have the ultimate burden of persuasion at trial." Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 982 (10th Cir. 2003).

When passing upon a motion for summary judgment, the court may not resolve factual disputes or make credibility determinations, even if the case is one which eventually will be tried without a jury. In re Unisys Savings Plan Litigation, 74 F.3d 420 (3d Cir. 1996). Rather, the court must resolve any ambiguities and draw all inferences against the moving party. Appleton v. Board of Education, 254 Conn. 205, 757 A.2d 1059 (2000); Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51 (2d Cir. 1991). The evidence of the party against whom summary judgment is sought must be believed. Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994). The court must construe the evidence in the light most favorable to the party opposing summary judgment and deny the motion unless no construction of the evidence could support judgment in the plaintiff's favor. Appleton, supra; Adickes v. S. H. Kress & Co., 398

U.S. 144, 157 (1970); Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 14 (2d Cir. 1993); United States v. Certain Funds on Deposit in Scudder Tax Free Investment Account #2505103, 998 F.2d 129 (2d Cir. 1993); Union Pacific Corp. v. United States, 5 F.3d 523, 525 (Fed. Cir. 1993); Suarez v. Dickmont Plastics Corp., 229 Conn. 99, 105 (1994); D.H.R. Construction Co. v. Donnelly, 180 Conn. 430, 434 (1980); Connell v. Colwell, 214 Conn. 242, 246-47 (1990).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

    To raise a genuine issue of material fact sufficient to defeat a summary judgment motion, the opponent need not match, item for item, each piece of evidence proffered by the moving party.  So long as the opponent has offered enough evidence to exceed the "mere scintilla" threshold, summary judgment is to be denied.  In re Unisys Savings Plan Litigation, supra, 74 F.3d 420, 433.

    Even if the nonmoving party's evidence appears "implausible," the court may not "weigh" the evidence and must proceed with the greatest caution.  R. B. Ventures, Ltd. v. Shane, 112 F.3d 54, 58-59 (2d Cir. 1997).  "If reasonable minds could differ as to the import of the evidence...and if...there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment."  Id. at 59, quoting Brady v.

5

Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988), and In re Japanese Elec Prods. Antitrust Litigation, 723 F.2d 238 (3d Cir. 1983) (internal quotation marks omitted).

"A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.' Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, '[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir. 1997). Citing Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

"[T]he Second Circuit has cautioned that, in cases where motive, intent or state of mind are at issue, summary judgment should be used sparingly." Ruscoe v. Housing Authority of City of New Britain, 259 F. Supp. 2d 160, 166 (D. Conn. 2003) (Nevas, J.), citing Dister v. Continental Group, Inc., 859 F.2 1108, 1114 (2nd Cir. 1988).

The plaintiff Pagliuco filed early in this case an affidavit which asserted the factual truth of every factual claim in the original Complaint.[1] That affidavit, together with the Complaint to which it refers, is submitted as Exhibit A to the plaintiffs' Local Rule 56 Statement. The plaintiffs also direct the court's attention to portions of the plaintiff Pagliuco's deposition transcript submitted by the defendants as their Exhibit 5.

---

[1] They are Items # 1 and 6 on the Docket Sheet, and both were filed on May 10, 2001.

Taking the evidence in the light most favorable to the plaintiffs, as the court must at this juncture, a jury could find the following:

The plaintiff 2284 Corporation is a Connecticut corporation which owned and operated a bar/cafe on Fairfield Avenue in Bridgeport, Connecticut, known by the name "Dangerous Curves". (Exhibit A, ¶ 3) The plaintiff Louis Pagliuco was an owner and officer of the plaintiff 2284 Corporation and managed the said bar/cafe. (Ibid.) At the time of the events in question in this case, the defendant Sapiro was a Sergeant in the Bridgeport Police Department who was the head of a special squad of police officers reporting directly to defendant Ganim and called the "Mayor's Office Special Task Force". (Id., ¶ 6) The plaintiff 2284 Corporation has been engaged since 1993 in the same business in which it was engaged from 1998 to the time this suit was filed. (Id., ¶ 9) In approximately 1998-1999, the plaintiff's clientele changed from being predominantly Caucasian to being predominantly African-American. (Id., ¶ 10) When the race of the majority of the plaintiff's customers became African-American, the defendants began a pattern and practice of unequal enforcement of the laws against the plaintiff in comparison with similarly situated businesses serving a predominantly Caucasian clientele. (Id., ¶ 11) The said pattern and practice of disparate and discriminatory enforcement of the laws included far more frequent police and health department inspections of the plaintiff's premises, far more rigorous enforcement of statutes and regulations, and far more severe penalties and other enforcement actions

against the plaintiff's business than of and against other comparable businesses catering to a predominantly Caucasian clientele.  (Id., ¶ 12)

An establishment similar to the plaintiffs' in the nature of its business and the activities which occurred there, known by the name Black Rock and Blue, located 3/4 of a mile from the plaintiff's but serving a predominantly Caucasian clientele, was never been raided by the defendants or their agents.  (Ibid.)  A bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, known as The Avenue Cafe, located 3/4 of a mile from the plaintiff's establishment but catering to a predominantly Caucasian clientele, was only very rarely raided by the defendants or their agents.  (Ibid.)  A bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, known as Black Rock Castle, located 1/2 mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents.  (Ibid.)  A bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, known as Kossuth Club Cafe, located 1/2 mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents.  (Ibid.)  An establishment with a liquor license, similar to the plaintiffs' in the nature of its business and the activities which occurred there, known as Taco Loco and located 1/2 mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents.  (Ibid.)  A bar similar to the plaintiffs' in the

nature of its business and the activities which occurred there, known as Rock and Roll Cafe, located 14 mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents. (Ibid.) An establishment serving alcoholic beverages, similar to the plaintiffs' in the nature of its business and the activities which occurred there, known as The Green Room, located 1/4 mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents. (Ibid.) A bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, known as Good Times Cafe, located 1/4 mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents. (Ibid.) A Go-Go bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, named Ruby's, located 150 yards from the plaintiff's establishment but serving a predominantly Caucasian clientele, was only rarely raided by the defendants or their agents. (Ibid.) A bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, named Sol's Cafe, located 3/4 of a mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents. (Ibid.) A bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, named Murphy's Law Cafe, located 3/4 of a mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents.

(Ibid.)  A bar and steakhouse similar to the plaintiffs' in the nature of its business and the activities which occurred there, named Tool House Restaurant, located 3/4 of a mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents.  (Ibid.)  A bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, named Captain Jax, located 3/4 of a mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants.  (Ibid.)

The plaintiffs' bar, which served a predominantly African-American clientele, was constantly being raided by the defendants and their agents.  (Ibid.)  The plaintiffs' bar was the most frequently raided bar in the City of Bridgeport during 1998-2001.  (Ibid.)  The second, third, fourth and fifth most raided bars in the City of Bridgeport during those years, which were respectively Keystone Cafe, Teddie's Cafe, Bishop's Corner and Club Innovation, all catered to a predominantly African-American clientele.  (Ibid.)

On December 3, 1998, defendant Sapiro in writing urged the Connecticut Liquor Commission to concentrate law enforcement efforts on the plaintiff's business for the stated reason that "[t]his place is a HOLE!!!"  (Id., ¶ 13)  On November 25, 1998, defendant Sapiro led an "inspection" team of ten armed officers which conducted a raid of the plaintiffs' premises because of what defendant Sapiro called "loitering, illegal parking [and] suspicious foot traffic in and around the Dangerous Curves Bar located on the corner of Fairfield and Hansen."  Defendant Sapiro also insisted that the Fire

Department send an inspector to conduct a further inspection of the premises despite the fact that there were no fire code violations on the premises.  As a result, the plaintiff was forced to endure disruptive raids or inspections which damaged its business and frightened away customers.  (Id., ¶ 14)  On June 5, 1999, defendant Sapiro wrote to an agent of the Connecticut Department of Consumer Protection stating with regard to the plaintiff's business premises:  "Let us know what else we can do about this place."  (Id., ¶ 15)

On December 23, 2000, defendant Gecewicz participated with defendant Boukhalil and other officers and employees of defendant City of Bridgeport in a raid upon the plaintiffs' premises.  Id., ¶ 16)  At approximately 3:40 p.m. on January 4, 2001, more than a week after the said raid, defendants Gecewicz and Boukhalil falsely and maliciously reported to the Connecticut Department of Children and Families that the plaintiff Pagliuco was endangering the morals, health and safety of his three-year-old son.  They falsely and maliciously claimed that during their raid on December 23, 2000, the plaintiff's little boy engaged them in conversations at Dangerous Curves in which he asked defendant Gecewicz what type of "broad" he wanted to go out with, whether he wanted her to have "little teats or big teats," whether he wanted a "babe," and whether he wanted her to have a "shaven bush" or a "full bush".  They further falsely and maliciously claimed that the child at that time stated that someday he would be the manager of the business.  (Id., ¶ 17)  As a result, the plaintiff Pagliuco and his family

11

were subjected to a detailed and intensive investigation by the Connecticut Department of Children and Families which completely exonerated them and concluded that the accusations of defendants Gecewicz and Boukhalil were false. (Id., ¶ 18) As a further result, the plaintiff Pagliuco's little boy had to undergo independent testing and evaluation by a licensed professional, at the expense of plaintiff Pagliuco, who also concluded that it was impossible for the false accusations of defendants Gecewicz and Boukhalil to have been truthful. (Id., ¶ 19) In fact, the plaintiff's child was never inside the premises when it was operating or open; the plaintiff never permitted that to happen. (Plaintiff's deposition transcript, Defense Exhibit 5, p. 67)

      The defendants' arguments, for the most part, are based on the erroneous assumption that their version of the facts is the one which this court must accept. In fact, the opposite is true. Thus, the defendants' argument that the comparators cited by the plaintiffs are insufficiently comparable to Dangerous Curves must fail. The court has before it an affidavit stating that they are comparable in every material way. Since this is not a "class of one" equal protection case but, rather, is one based on the malice and racism of the defendants, the test for comparability utilized in Title VII cases is the one which this court must apply. "[W]here a plaintiff seeks to make out her prima facie case by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated....In Shumway [v. United

12

Parcel Service, Inc., 118 F.3d 60 (2d Cir. 1997)], we explained that such an employee 'must be similarly situated in all *material* respects' – not in *all* respects. 118 F.3d at 64 (emphasis added). A plaintiff is not obligated to show disparate treatment of an *identically* situated employee. To the contrary, Shumway holds that in those cases in which a plaintiff seeks to establish her minimal prima facie case by pointing to disparate treatment of a similarly situated employee, it is sufficient that the employee to whom the plaintiff points be similarly situated in all material respects....In other words, where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." McGuinness v. Lincoln Hall, 263 F.3d 49, 53-54 (2d Cir. 2001). The comparables submitted by the plaintiffs meet this liberal test, so the defendants' first argument fails.

      The defendants' claim that the plaintiffs cannot sue the defendants for discriminating against them because of the race of their customers unless the plaintiffs themselves are of that race, runs up against the firmly established rule that racial classifications injure *everybody*, and not just the members of the targeted race, and are subject to a "strict scrutiny" test whenever they are applied. *E.g.,* Johnson v. California, ___ U.S. ___, 125 S. Ct. 1141 (2005). Moreover, the defendants' argument fails when measured against well-established law in this and other circuits. In Yerardi's Moddy

13

Street Restaurant & Lounge v. Board of Selectmen, 932 F.2d 89, 92 (1st Cir. 1991), the First Circuit held that a municipal board could be liable for violation of the equal protection rights of a liquor licensee if that licensee could prove that the board had imposed an earlier closing time upon it than upon other licensees similarly situated and "that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." 932 F.2d at 92, quoting LeClaire v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980) (emphasis supplied). The First Circuit has continued to stand by that holding. Tapalian v. Tusino, 377 F.3d 1 (1st Cir. 2004); Rubinovitz v. Rogato, 60 F.3d 906 (1st Cir. 1995). The Second Circuit has repeatedly and consistently reaffirmed its adherence to this cause of action and in particular to the view that treating a person differently from others similarly situated solely because of a "malicious or bad faith intent to injure the person" is an equal protection violation actionable under Section 1983. Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12 (2d Cir. 1999); Crowley v. Courville, 76 F.3d 47, 52-53 (2d Cir. 1996); Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995); LaTrieste Restaurant and Cabaret, Inc. v. Village of Port Chester, 40 F.3d 587 (2d Cir. 1994); Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1352 (2d Cir. 1994); FSK Drug Corp. v. Perales, 960 F.2d 6, 10 (2d Cir. 1992). See also Get Away Club, Inc. v. Coleman, 969 F.2d 664 (8th Cir. 1992); Schnabel v. Tyler, 230 Conn. 735, 762, 646 A.2d 152 (1994). The facts in this case are

sufficient to permit a jury to find this sort of impermissible, and actionable, motive by the defendants.

The argument of defendant Sapiro that he is entitled to qualified immunity really is too vague to be addressed in a particularly meaningful way.[2]  "A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him is not prohibited by federal law...; or (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct...; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken."  O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 36 (2nd Cir. 2003) (citations, quotation marks and ellipses omitted).  Sapiro does not indicate which of these three approaches he seeks to rely upon and offers no analysis of the applicability of the facts of this case to the general legal principles he summarizes.  Clearly, he has not carried his burden on this claim.

---

[2] Qualified immunity is an affirmative defense, Harlow v. Fitzgerald, 457 U.S. 800 at 815 (1982); Schechter v. Comptroller of the City of New York, 79 F.3d 265, 270 (2d Cir. 1996); Black v. Coughlin, 76 F.3d 72, 75 (2d Cir. 1996); Castro v. United States, 34 F.3d 106, 111 (2d Cir. 1994); which is not available to municipalities. Owen v. City of Independence, 445 U.S. 622 (1980); Ford v. Reynolds, 316 F.3d 351, 356 (2nd Cir. 2003).  Although the City of Bridgeport claims it is not a proper defendant in this case, the burden on a motion for summary judgment rests with the moving party, and Bridgeport has failed to come forward with anything to support that argument.

We turn now to the actions of defendants Gecewicz and Boukahillalai. They first claim that they simply made a truthful report to DCF. That claim fails because the plaintiff's contrary affidavit and deposition testimony governs for this purpose. Thus, the relevant facts for purposes of the plaintiff's federal and state claims against them are that they fabricated false accusations against the plaintiff Pagliuco. They falsely attributed truly gross and disgusting statements to his three-year-old child in an attempt to have the child removed from the parental home. DCF investigated these false allegations and found them to be false indeed. These are the facts for present purposes.

The first question, then, is whether Gecewicz and Boukahillalai are entitled to state statutory immunity for these lies. The answer unquestionably is that they are not. The state statute in question is Section 17a-101(e)(b) of the General Statutes, which provides: "Any person, institution or agency which, in good faith, makes the report pursuant to section[] 17a-101a...shall be immune from any liability, civil or criminal, which might otherwise be incurred or imposed and shall have the same immunity with respect to any judicial proceeding which results from such report...." Obviously, the immunity does not apply if the reporter did not act in good faith. The facts which must be assumed for present purposes are that the defendants lied, that they fabricated their accusations (as, indeed, the DCF eventually concluded they had), and thus could not have acted in good faith.

The second question is whether fabricating such an outrageous accusation could be found by a jury to be "extreme and outrageous" conduct for state law purposes or "conscience shocking" conduct for substantive due process purposes. That question has been answered in the affirmative by at least two Connecticut judges. Greco v. Anderson, 2000WL 1763732, 28 Conn. L. Rptr. 605 (2000) (Shortall, J.); Chain v. Biddle, 1999 WL 179623, 24 Conn. L. Rptr. 201 (1999) (Licari,J.). *See also* Doe v. Julia Day Nursery, 1998 WL 813474, 23 Conn. L. Rptr. 360 (1998) (Corradino, J.) (holding that such conduct easily meets the "immoral" and "oppressive" test for purposes of an unfair trade practices claim).

Conduct which can fairly be called "outrageous" like this is sufficient to submit to a jury under the "conscience shocking" standard of Fourteenth Amendment substantive due process. *E.g.*, Limone v. Condon, 372 F.3d 39, 45 (1st Cir. 2004) (deliberately framing an innocent man). See also Black v. Stephens, 662 F.2d 181, 188 (3rd Cir. 1981), *cert. denied*, 455 U.S. 1008 (1982) (police officer pointed a gun at a motorist); Hawkins v. Holloway, 316 F.3d 777, 787 (8th Cir. 2003) (sheriff pointed loaded firearm at a deputy).

The motion for summary judgment must be denied.

          Respectfully submitted:


          _____
          JOHN R. WILLIAMS (ct00215)
          51 Elm Street
          New Haven, CT 06510
          203/562-9931
          FAX: 203/776-9494
          E-Mail: jrw@johnrwilliams.com
          Attorney for Plaintiffs


**CERTIFICATION OF SERVICE**

This is to certify that a copy has been sent by U.S. Mail on the date above stated to:

John H. Barton, Esq.
Associate City Attorney
999 Broad Street, 2nd Floor
Bridgeport CT 06604


          _____
          JOHN R. WILLIAMS