UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| LOUIS PAGLIUCO and : | |
| 2284 CORPORATION : | |
| : | |
| VS. : | NO.  3:01CV836 (WIG) |
| : | |
| CITY OF BRIDGEPORT, : | |
| JOSEPH GANIM, : | |
| THOMAS E. GECEWICZ, : | OCTOBER 30, 2005 |
| ROBERT SAPIRO and : | |
| JOSTTE BOUKAHILLALAI, M.D. : | |

**PLAINTIFFS' LOCAL RULE 56 STATEMENT**

*A*   *RESPONSE TO DEFENDANTS' CLAIMS OF FACT:*

1. Agree.

2. Disagree.  The year 2998 has not yet arrived.

3. Agree.

4. Agree.

5. Agree.

6. Disagree.  (Plaintiff's Deposition Transcript, p. 20)

7. Agree.

8. Disagree.  (Plaintiff's Deposition Transcript, p. 20)

9. Agree.

1

10. Agree.

11. Agree.

12. Agree that many citations were issued.  Otherwise, disagree.  (Exhibit A)

13. Agree.

14. Agree.

15. Agree.

16. Agree.

17. Agree.

18. Agree.

19. Agree.

20. Disagree.  (Exhibit A)

21. Agree that defendants Gecewicz and Boukhalil filed a report with the Department of Children and Families.  Otherwise, disagree.  (Exhibit A)

22. Agree.


**B    PLAINTIFFS' STATEMENT OF MATERIAL FACTS:**

1. The plaintiff 2284 Corporation is a Connecticut corporation which owned and operated a bar/cafe on Fairfield Avenue in Bridgeport, Connecticut, known by the name "Dangerous Curves".  (Exhibit A, ¶ 3)

2. The plaintiff Louis Pagliuco was an owner and officer of the plaintiff 2284

Corporation and managed and manages the said bar/cafe.  (Ibid.)

    3.  At the time of the events in question in this case, the defendant Sapiro was a Sergeant in the Bridgeport Police Department who was the head of a special squad of police officers reporting directly to defendant Ganim and called the "Mayor's Office Special Task Force".  (Id., ¶ 6)

    4.  The plaintiff 2284 Corporation has been engaged since 1993 in the same business in which it was engaged from 1998 to the time this suit was filed.  (Id., ¶ 9)

    5.  In approximately 1998-1999, the plaintiff's clientele changed from being predominantly caucasian to being predominantly African-American.  (Id., ¶ 10)

    6.  When the race of the majority of the plaintiff's customers became African-American, the defendants began a pattern and practice of unequal enforcement of the laws against the plaintiff in comparison with similarly situated businesses serving a predominantly Caucasian clientele.  (Id., ¶ 11)

    7.  The said pattern and practice of disparate and discriminatory enforcement of the laws included far more frequent police and health department inspections of the plaintiff's premises, far more rigorous enforcement of statutes and regulations, and far more severe penalties and other enforcement actions against the plaintiff's business than of and against other comparable businesses catering to a predominantly Caucasian clientele.  (Id., ¶ 12)

    8.  An establishment similar to the plaintiffs' in the nature of its business and the

activities which occurred there, known by the name Black Rock and Blue, located 3/4 of a mile from the plaintiff's but serving a predominantly Caucasian clientele, was never been raided by the defendants or their agents. (Ibid.)

9.  A bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, known as The Avenue Cafe, located 3/4 of a mile from the plaintiff's establishment but catering to a predominantly Caucasian clientele, was only very rarely raided by the defendants or their agents. (Ibid.)

10.  A bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, known as Black Rock Castle, located 1/2 mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents. (Ibid.)

11.  A bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, known as Kossuth Club Cafe, located 1/2 mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents. (Ibid.)

12.  An establishment with a liquor license, similar to the plaintiffs' in the nature of its business and the activities which occurred there, known as Taco Loco and located 1/2 mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents. (Ibid.)

13.  A bar similar to the plaintiffs' in the nature of its business and the activities

which occurred there, known as Rock and Roll Cafe, located 14 mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents.  (Ibid.)

14.  An establishment serving alcoholic beverages, similar to the plaintiffs' in the nature of its business and the activities which occurred there, known as The Green Room, located 1/4 mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents.  (Ibid.)

15.  A bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, known as Good Times Cafe, located 1/4 mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents.  (Ibid.)

16.  A Go-Go bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, named Ruby's, located 150 yards from the plaintiff's establishment but serving a predominantly Caucasian clientele, was only rarely raided by the defendants or their agents.  (Ibid.)

17.  A bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, named Sol's Cafe, located 3/4 of a mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents.  (Ibid.)

18.  A bar similar to the plaintiffs' in the nature of its business and the activities

which occurred there, named Murphy's Law Cafe, located 3/4 of a mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents. (Ibid.)

19. A bar and steakhouse similar to the plaintiffs' in the nature of its business and the activities which occurred there, named Tool House Restaurant, located 3/4 of a mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants or their agents. (Ibid.)

20. A bar similar to the plaintiffs' in the nature of its business and the activities which occurred there, named Captain Jax, located 3/4 of a mile from the plaintiff's establishment but serving a predominantly Caucasian clientele, was never raided by the defendants. (Ibid.)

21. The plaintiff's bar, which served a predominantly African-American clientele, was constantly being raided by the defendants and their agents. (Ibid.)

22. The plaintiffs' bar was the most frequently raided bar in the City of Bridgeport during 1998-2001. (Ibid.)

23. The second, third, fourth and fifth most raided bars in the City of Bridgeport during those years, which were respectively Keystone Cafe, Teddie's Cafe, Bishop's Corner and Club Innovation, all catered to a predominantly African-American clientele. (Ibid.)

24. On December 3, 1998, defendant Sapiro in writing urged the Connecticut

Liquor Commission to concentrate law enforcement efforts on the plaintiff's business for the stated reason that "[t]his place is a HOLE!!!"  (Id., ¶ 13)

25.   On November 25, 1998, defendant Sapiro led an "inspection" team of ten armed officers which conducted a raid of the plaintiffs' premises because of what defendant Sapiro called "loitering, illegal parking [and] suspicious foot traffic in and around the Dangerous Curves Bar located on the corner of Fairfield and Hansen." Defendant Sapiro also insisted that the Fire Department send an inspector to conduct a further inspection of the premises despite the fact that there were no fire code violations on the premises.  As a result, the plaintiff was forced to endure disruptive raids or inspections which damaged its business and frightened away customers.  (Id., ¶ 14)

26.   On June 5, 1999, defendant Sapiro wrote to an agent of the Connecticut Department of Consumer Protection stating with regard to the plaintiff's business premises:  "Let us know what else we can do about this place."  (Id., ¶ 15)

27.   On December 23, 2000, defendant Gecewicz participated with defendant Boukhalil and other officers and employees of defendant City of Bridgeport in a raid upon the plaintiffs' premises.  Id., ¶ 16)

28.   At approximately 3:40 p.m. on January 4, 2001, more than a week after the said raid, defendants Gecewicz and Boukhalil falsely and maliciously reported to the Connecticut Department of Children and Families that the plaintiff Pagliuco was endangering the morals, health and safety of his three-year-old son.  They falsely and

maliciously claimed that during their raid on December 23, 2000, the plaintiff's little boy engaged them in conversations at Dangerous Curves in which he asked defendant Gecewicz what type of "broad" he wanted to go out with, whether he wanted her to have "little teats or big teats," whether he wanted a "babe," and whether he wanted her to have a "shaven bush" or a "full bush".  They further falsely and maliciously claimed that the child at that time stated that someday he would be the manager of the business.  (Id., ¶ 17)

29. As a result, the plaintiff Pagliuco and his family were subjected to a detailed and intensive investigation by the Connecticut Department of Children and Families which completely exonerated them and concluded that the accusations of defendants Gecewicz and Boukhalil were false.  (Id., ¶ 18)

30. As a further result, the plaintiff Pagliuco's little boy had to undergo independent testing and evaluation by a licensed professional, at the expense of plaintiff Pagliuco, who also concluded that it was impossible for the false accusations of defendants Gecewicz and Boukhalil to have been truthful.  (Id., ¶ 19)

31. In fact, the plaintiff's child was never inside the premises when it was operating or open; the plaintiff never permitted that to happen.  (Plaintiff's deposition transcript, Defense Exhibit 5, p. 67)

          THE PLAINTIFFS

BY:_____
        JOHN R. WILLIAMS (ct00215)
        51 Elm Street
        New Haven, CT 06510
        203/562-9931
        FAX:  203/776-9494
        E-Mail: jrw@johnrwilliams.com
        Their Attorney

**CERTIFICATION OF SERVICE**

This is to certify that a copy has been sent by U.S. Mail on the date above stated to:

John H. Barton
Associate City Attorney
Office of the City Attorney
City of Bridgeport
999 Broad Street, 2nd Floor
Bridgeport CT 06604

_____
JOHN R. WILLIAMS